UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 06-107-KKC

UNITED STATES OF AMERICA                                              PLAINTIFF

vs:                    RECOMMENDED DISPOSITION OF
                            MOTION TO SUPPRESS

RONALD DEATON STATON                                                DEFENDANT

\* \* \* \* \* \* \*

Defendant, Ronald Deaton Staton, moves to suppress evidence in this action. *See* DE#11. The Grand Jury indicted Staton on three counts alleging violations of 21 U.S.C. § 841(a)(1), related to Schedule II and III controlled substances, and one accompanying violation of 18 U.S.C. § 924(c)(1). *See* DE#1. The Government relies on incriminating evidence recovered from a search of Defendant's residence and statements Defendant made to authorities immediately following the search. In the motion to suppress, Defendant submits that the warrantless search was unconstitutional and that the police interview violated Defendant's *Miranda* rights.

The Court conducted an evidentiary hearing on November 13, 2006. A preliminary issue involved the Government's failure to produce an audiotape of key interaction between the Defendant and law enforcement. State authorities had been unable to locate that tape as of the hearing. Although the Court received proof on November 13, the Court also held the hearing open for additional evidence, if the tape were located. Fortunately, the tape surfaced, and the United States timely produced a copy to Defendant and tendered one to the Court, authenticated by affidavit.

Defendant did not request a further hearing after receipt of the tape. Both parties did file post-hearing briefs that discussed the relevant issues and the content of the tape.

At the hearing, Detective Matt Bryant, with the Rockcastle County Sheriff's Department, and DEA Task Force Officer/Rockcastle Sheriff's Det. Barry Adams testified. After the hearing, the Court reviewed in full the audiotape that recorded portions of the relevant undercover operation, search, and police interview. The Court afforded both Defendant and the United States a full and fair opportunity to present evidence, cross-examine witnesses, tender relevant materials, and make argument. Based on the record, and considering the standards and burdens of production and proof applicable in the suppression context, the Court makes the following recommended findings of fact and conclusions of law.

RECOMMENDED FINDINGS OF FACT<br>AND CONCLUSIONS OF LAW

1.     In early 2005 or late 2004, authorities received information that Defendant was trafficking in controlled substances. According to TFO Adams, this information primarily stemmed from complaints by persons living in the area of Defendant's residence. Local residents apparently directed their complaints to Constable Roger Pigg, who serves the Rockcastle County district that includes Defendant's residence. The complaints indicated that Defendant was unlawfully selling OxyContin and Methadone. TFO Adams estimated that the complaints started approximately two months before police searched Defendant's residence, which is in the northern part of Rockcastle County.

2.     In addition to drug trafficking, reports indicated that Defendant was armed. Det. Bryant explained that Defendant allegedly carried a .9 millimeter semi-automatic pistol in his back pocket when conducting illicit drug transactions.

3.      Based on his training and experience, TFO Adams testified that the information against Defendant from the complaints did not establish probable cause to justify issuance of a search warrant.

4.      Lacking probable cause to obtain a warrant, authorities attempted to perform an undercover, controlled purchase of drugs from Defendant at his residence on February 25, 2005. The controlled purchase involved four officers: Det. Bryant, TFO Adams, Constable Roger Pigg, and Steve Isaacs, a Fish and Wildlife officer.

Of the four, only Det. Bryant operated undercover. He traveled to Defendant's residence in an unmarked car and wore plain clothes, including a black, hooded sweatshirt. The three remaining officers positioned themselves approximately half a mile from Defendant's residence, out of sight from Defendant's home.

5.      Det. Bryant also wore a concealed audio recording device. The device, however, did not transmit the conversation. Thus, the other three officers could not contemporaneously hear Det. Bryant's interaction with Defendant.

6.      Det. Bryant approached Defendant's residence late in the afternoon on February 25, 2005. The tape suggests the approach occurred around 6:38 p.m. Det. Bryant met Defendant at the front door, and in an effort to purchase drugs, asked Defendant whether Defendant could "hook him up." Det. Bryan explained that a person named "Holly" had directed him to Defendant's house.

Defendant quickly rejected the overture and asserted that "Holly" was misinformed. Defendant did, however, ambiguously refer Det. Bryant to a residence immediately behind Defendant's home. Det. Bryant followed this suggestion, but it also proved futile.

7.      Det. Bryant almost immediately returned to Defendant's residence, at approximately 6:40 p.m that evening, in the same unmarked car. According to his testimony, Det. Bryant then intended to perform a "knock-and-talk" on this second visit.[1] Before re-approaching Defendant's residence, Det. Bryant called for backup due to information that Defendant carried a firearm. This call prompted the three other officers, sitting less than a mile away, to "hurry" to the scene.

8.      According to Det. Bryant, Defendant was standing just inside a screen door adjoining the front porch when Det. Bryant began to re-approach the residence. Although Defendant stood behind the door, and it was becoming "dusky dark" at that time, Det. Bryant testified that the two made eye contact. Bryant testified the light was "good enough" for Bryant to see Defendant through the door. Unlike on the first visit, when Det. Bryant acted undercover, Det. Bryant explained that for the second approach he "clearly" displayed his badge, had the hood of his sweatshirt down, and verbally identified himself as a law enforcement officer as he neared the front porch.

The audio recording does not reflect any verbal identification by Det. Bryant. By way of argument, Defendant suggests that the lack of sunlight and the absence of any porch lights or street lamps obscured the visibility of the badge. Under these circumstances, Defendant implies that he was naturally apprehensive when the "stranger" returned that evening after previously–and unsuccessfully–attempting to purchase drugs. The tape does support that Det. Bryant overtly showed his badge. On that tape, arguably referring to the badge, Bryant emphatically asks Staton, "See this right here?" [Further, after the arrival of back-up, Det. Bryant repeatedly describes the

---

[1] A "knock-and-talk," Det. Bryant explains, is where police approach a residence in an informal manner, attempt to speak with the person or persons living there, explain there are complaints involving the property or its residents, and ask for consent to search. The second approach by Bryant clearly signaled an end to the undercover nature of the operation.

interaction to other officers as having included Bryant's clear presentation of the badge to Defendant.]

9. Upon reaching the front porch, Det. Bryant testified that he perceived a quick motion by Defendant towards his hips. Believing that Defendant intended to draw a weapon, Det. Bryant maneuvered to the side of the door and verbally commanded Defendant to desist and show his hands. Defendant soon complied and emerged from the front door with a gun hanging by his finger. Defendant then threw the gun into a swing on the front porch. At that time, Det. Bryant instructed Defendant to place his hands on the front porch railing. This testimony is unchallenged, and the Court finds that the confrontation described by Det. Bryant is substantially consistent with the events captured on audiotape.

10. Backup units appeared shortly, as Det. Bryant gained control over Defendant. TFO Adams recalls that Det. Bryant had his gun drawn when the backup units arrived. However, TFO Adams and Det. Bryant both testified that no other officer drew his weapon at any point. Det. Bryant reholstered his weapon upon securing Defendant.

11. On the audiotape, TFO Adams directed one of the accompanying officers to handcuff Defendant. The officers secured Defendant and performed a pat-down as bickering promptly ensued between Det. Bryant and Defendant. It appears from the audiotape that TFO Adams decided to inspect the gun or something discovered on Defendant's person. At this time, TFO Adams also explained to Defendant that he was *not* then under arrest.

12. Within moments after backup units secured Defendant, TFO Adams attempted to gain Defendant's consent to search the residence. TFO Adams asked Defendant to "listen" to him, as Defendant and Det. Bryant continued to argue. TFO Adams gained Defendant's attention and

stated, "Listen to me. We'd like to [or, perhaps, 'we need to'] take a look around inside your house." Defendant twice and without hesitation audibly replied, "Go for it."

Based on the tape and testimony, it appears that no guns were drawn or aimed at Defendant when he "consented" to the search of his home. Det. Bryant was the only officer to draw his gun at any point during the events in question, and he testified that he reholstered the weapon after disarming Defendant. Both officers also stated that Defendant was not handcuffed, but the audiotape strongly indicates otherwise. The audiotape captures TFO Adams advising another officer to handcuff Defendant shortly after the backup units arrived and just prior to the consent inquiry. Further, the tape preserves the sound of adjusting cuffs.

13.     After Defendant "consented" to the search, TFO Adams instructed Defendant to step inside the house with the officers.[2] The officers seated Defendant on his couch after searching it for weapons.[3] The audiotape and testimony reflect that Det. Bryant and Constable Pigg then began searching the residence. At the same time, TFO Adams began to talk to Defendant. Unfortunately, the audiotape does not capture the entire relevant conversation because the search by Det. Bryant, who wore the recording device, separated him from the interview and/or inadvertently muffled the sound recording. Det. Bryant did not intend to record the interview. Any useful audio on these issues is coincidental.

---

[2] The Court notes this is contrary to the testimony of both officers. They testified that Defendant invited them into the house because it was cold outside.

[3] The officers testified that Defendant was not cuffed during the interview. They **may** have removed the restraints previously applied. Certain interaction on the tape–*e.g.*, Defendant's request that he be given his watch to wear–suggests that Defendant was not handcuffed for the entirety of the interaction.

TFO Adams expressly testified that he explained the nature of the complaints against Defendant and read Defendant his *Miranda* rights **prior to beginning the actual interview or questioning.**  Although TFO Adams did not recall the exact sequence of the *Miranda* warning relative to the search, Adams was confident that he read the *Miranda* warnings before questioning Defendant.  Adams described in detail the yellow card, containing the *Miranda* requirements, that he used on that night and carries with him for such circumstances.  Due to inaudible gaps, the tape neither confirms nor disproves the testimony by TFO Adams.

14.  The search lasted approximately two hours.  In addition to the firearm, the search produced roughly $12,000 in cash and a large quantity of illegal drugs.  During the interview, Defendant admitted to selling OxyContin, Percocet, and Methadone and discussed the source of his supply.  The interview produced multiple incriminating statements by Defendant.

Defendant moves to suppress the seized evidence and his statements.  Defendant submits that his consent to search, under these facts, was involuntary.  Defendant also contends that TFO Adams questioned him without supplying the required *Miranda* warnings, mandating suppression.

**Consent to Search**

15.  Warrantless searches are per se unreasonable under the Fourth Amendment–subject to specifically established and delineated exceptions.  *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994).  Consent to search is one such exception.  *See Roark*, 36 F.3d at 17; *United States v. Taylor*, 956 F.2d 572, 589 n.14 (6th Cir. 1992).  When the constitutionality of a warrantless search rests on consent, the government has the burden of proving that the defendant freely and voluntarily provided the necessary consent.  *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983);

*Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The United States thus bears the burden on this issue, by a preponderance, and must show "clear and positive" evidence of consent. *See United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996).

Whether consent is voluntary or the product of duress or coercion is determined by a totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Relevant circumstances to be considered, concerning the accused, include evidence of: minimal schooling; low intelligence; age; whether authorities advised the accused of his rights; the length of any detention prior to consent; prolonged or repeated questioning; and the use of physical punishment, such as deprivation of food or sleep. *See id.* at 226; *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995). Other factors identified by the Supreme Court involve whether the defendant is a "newcomer to the law," the location or setting at the time a defendant consented, and whether the police used promises or threats of force. *See United States v. Watson*, 423 U.S. 411, 424-25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Crowder*, 62 F.3d at 787. After evaluating these factors and the circumstances of the instant case, the Court finds as a fact the Defendant freely and voluntarily provided the officers with effective consent to search the residence at issue.

Although Defendant received a limited education,[4] the Court first notes that Defendant did not argue that he is "mentally deficient" or lacks at least average intelligence. *See Watson*, 423 U.S. at 424-25; *Bustamonte*, 412 U.S. at 226. Moreover, at age sixty, Defendant is not a youth, and Defendant's criminal history reflects that he certainly is no "newcomer to the law." *See Bustamonte*, 412 U.S. at 226; *Watson*, 423 U.S. at 424-25. Indeed, the pretrial record indicates that Defendant

---

[4]Defendant reported to the United States Probation Officer that he completed the eighth grade before leaving school.

-8-

has at least five adult criminal convictions resulting in periods of incarceration from twenty to ninety days.

Secondly, there is no evidence that authorities used inappropriate threats, promises, or physical punishment to obtain Defendant's consent in this case. *See Watson*, 423 U.S. at 424; *Bustamonte*, 412 U.S. at 226. Admittedly, Det. Bryant drew his weapon, and, once backup units arrived, the four officers surrounded Defendant on the front porch, frisked him, and secured him–probably with the use of handcuffs. The Court finds, however, that these tactics were reasonable under the circumstances and did not render Defendant's consent involuntary.

Police may draw their guns as a reasonable precaution and still obtain a valid consent. *See United States v. Scott*, 578 F.2d 1186, 1189 (6th Cir. 1978). Moreover, Det. Bryant testified that he reholstered his weapon after disarming Defendant, which occurred before Defendant consented to the search. This sequence of events is consistent with the audiotape. Both Det. Bryant and TFO Adams further testified that none of the other three officers drew his weapon. The likelihood of coercion lessens because no weapons were drawn or displayed at the time Defendant consented to the search. *See United States v. Blakeney*, 942 F.2d 1001, 1015-16 (6th Cir. 1991); *United States v. Jackson*, 70 Fed. Appx. 844, 847 (6th Cir. 2003); *United States v. Tolley*, 1999 WL 137620, at *7 (6th Cir. 1999).

Likewise, police may obtain valid consent from a suspect that is in custody. *See Watson*, 423 U.S. at 424. In this case, the officers did detain Defendant on his front porch. Although detaining Defendant and placing him in handcuffs is a voluntariness factor, the action does not conclusively invalidate Defendant's consent. *See id*.

Ultimately, the presence and limited display of weapons and Defendant's detention do not outweigh the reasonable and responsible use of those tactics in this case. The officers did not rely on the sort of unsettling conduct–*i.e.*, threats, promises, or physical punishment–that the Supreme Court traditionally decries in the consent context. *See Watson*, 423 U.S. at 424-25; *Bustamonte*, 412 U.S. at 226. The officers were armed and Det. Bryant previously drew his weapon against Defendant, but testimony and the audiotape suggests the authorities acted reasonably and that the force used did not infect the consent request or grant. Under these facts, the actions undertaken by police did not invalidate Defendant's consent.

Third, the police did not isolate and remove Defendant to a hostile or adversarial setting. *See Watson*, 423 U.S. at 424 (identifying a defendant's consent to search on a public street–as opposed to the confines of a police station–as a factor indicating voluntariness). Rather, the officers confronted Defendant at his residence. *See United States v. Blakeney*, 942 F.2d 1001, 1016 (6th Cir. 1991)(noting that defendant's "consent was not given in a police station, but at his home" as evidence of free choice). Furthermore, the officers did not subject Defendant to a lengthy detention or interrogation on his front porch before gaining consent. *See Bustamonte*, 412 U.S. 226. Instead, the audiotape reflects that TFO Adams requested permission to search the residence within moments after the officers disarmed and secured Defendant, and Defendant gave consent the very first time authorities asked for it.

Fourth, defense counsel emphasizes that authorities did not advise Defendant of his rights or his ability to refuse consent before Defendant gave the officers permission to search his residence. The Court recognizes that Defendant's unawareness of his right to refuse consent is a factor, but the absence of this knowledge is not controlling. *See Watson*, 423 U.S. at 424; *United States v. Erwin*,

155 F.3d 818, 823 (6th Cir. 1998). The Constitution does not require the government to prove that the defendant knew his rights, in this context, in order to establish effective consent. *See United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In this case, the totality of the circumstances persuades the Court that Defendant freely and voluntarily consented to the search even though law enforcement did not inform Defendant of his right to refuse consent.

Lastly and perhaps most importantly from an evidentiary standpoint, the tape shows Defendant's consensual demeanor. After TFO Adams requested permission to search the residence, Defendant provided a prompt and straightforward answer in the affirmative. Defendant did not hesitate, ask any questions, or express any doubts. Nor did Defendant reconsider his decision thereafter. There is no evidence that the officers pressured, intimidated, or persuaded the Defendant to consent to the search. The audiotape reflects a calm, independent, and decisive judgment by Defendant. More than any other factor, Defendant's prompt, unquestioned, and unpressured choice to permit the search of his residence convinces the Court that Defendant freely and voluntarily consented.[5] By twice directing authorities to "Go for it," Defendant clearly demonstrated assertive faculties and the consent to search.

---

5

Defendant did not object to the way in which TFO Adams *phrased* his request for consent to search Defendant's residence, but the form of the question may sometimes merit consideration. *See United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998). Consent is not voluntary when police deliver their request in a fashion that merely compels the acquiescence of the accused.

In the instant case, TFO Adams explained to Defendant that "[w]e'd like to [or 'we need to'] take a look around inside your house." Although not exactly interrogative, the Court still finds that the comment provided Defendant with a meaningful opportunity to evaluate and refuse consent. *See id*. The words by TFO Adams, while phrased imperfectly, did not imply that Defendant could only acquiesce to the proposed search. *See United States v. Pena*, 143 F.3d 1363, 1366-67 (10th Cir. 1998)(finding consent where officer queried "You wouldn't mind if I looked then, if I had a look in the room?" and defendant replied "Go ahead.").

Further, Defendant's tone plainly supports the validity of the consent. On the tape, as soon as Det. Bryant secured Defendant, Defendant began to argue with Det. Bryant about the events of the evening. Defendant stated the argument in assertive, yet rational terms. Throughout the entirety of the hour+ tape duration, Defendant laughs, protests, jokes with the officers, and asks many questions. Det. Bryant and TFO Adams described Defendant as "jovial" or "jolly." The tape dispels any notion that the circumstances intimidated or coerced Defendant in any respect.

After carefully weighing the identified factors and evidence, the Court rejects Defendant's contention that his consent was ineffective. The Court finds, under the totality of circumstances presented, that the United States has satisfactorily proven that Defendant freely and voluntarily consented to the search request. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**Unadvised and Unwarned Statements**

16.     While Det. Bryant and Constable Pigg searched Defendant's home, TFO Adams interviewed Defendant inside the residence. The interview yielded incriminating statements by Defendant that are presently at issue. The parties appear to concede–and the Court assumes–that the interview constituted a custodial interrogation and that Defendant did not volunteer his statements.[6] In these circumstances, there is a presumption that the statements by Defendant are the

---

[6]

Although the authorities assured Defendant he was "not under arrest" during the search, the later questioning undoubtedly qualifies as custodial interrogation. Defendant was in handcuffs and under the physical control of the officers and surely was not free to leave. Further, on the tape, Det. Bryant described Defendant as "in custody."

Defendant only obliquely attacks the basis for custody. The Court finds that Det. Bryant would have had probable cause to arrest Defendant based on Defendant's perceived attempt to pull a weapon on a law officer. Det. Bryant adequately established his reasonable basis for believing that Defendant had tried to draw a gun. To the extent Defendant tries to argue that probable cause did not exist for the custodial interrogation, the Court thus rejects the argument. The formal arrest,

product of police coercion, *in the absence of specific warnings*. *See United States v. Gilkeson*, 431 F.Supp.2d 270, 283 (N.D.N.Y. 2006)(citing United *States v. Patane*, 542 U.S. 630, 639, 24 S.Ct. 2620, 159 L.Ed.2d 667 (2004)). This presumption is generally irrebuttable. *See id*.

Defendant submits that he made incriminating statements without proper advice of his rights. To substantiate his claim, Defendant notes that the audiotape does not capture TFO Adams, or any other officer, giving the *Miranda* warnings to Defendant prior to the interview. On this basis, Defendant concludes that the Court must suppress the incriminating statements because the irrebuttable presumption of coercion applies. *See id*.

Defendant overestimates the value of the audiotape. Because of ill-timed and inaudible gaps in the recording, the tape is inconclusive and neither confirms nor refutes whether and when the officers advised Defendant of his rights.[7] As such, the Court turns to the testimony at the hearing to resolve this issue.

First, and most notably, TFO Adams testified without reservation that he discussed the nature of the complaints with Defendant and advised Defendant of his *Miranda* rights *prior* to the interview.[8] This is also consistent, to a large degree, with the testimony by Det. Bryant. He

---

which followed the search, legitimately and independently rested on the contraband seized from Defendant's residence during the consensual search.

[7] Testimony at the hearing and the audiotape indicate that the interview between TFO Adams and Defendant started shortly after Defendant consented to the search and the parties entered the residence. During this time, testimony and the audiotape further reflect that Det. Bryant, the one wearing the recording device, separated from TFO Adams to begin the search of Defendant's residence. As a result of this separation and the noise generated by Det. Bryant's search efforts, pertinent portions of the interview are simply inaudible.

[8] Although unsure of the sequence, TFO Adams believes he addressed the complaints with Defendant first and then read the *Miranda* warnings to Defendant from a yellow card that he keeps

explained that TFO Adams advised Defendant of his rights shortly after the officers entered the residence and seated Defendant on the couch.[9]

Secondly, the Court finds no reason to reject the testimony by TFO Adams. TFO Adams is a credible witness. He is a veteran law enforcement officer with fourteen years of experience that includes over 200 narcotics investigations. Moreover, the Court believes his instant testimony is truthful and accurate. TFO Adams unequivocally testified that he advised Defendant of his rights before beginning the interview. He is a seasoned officer who is well aware of his obligations under *Miranda*, and who is unlikely to overlook such a fundamental legal norm. Indeed, TFO Adams is so careful to comply with his obligations under *Miranda* that he keeps a reprinted model of the *Miranda* warnings in his wallet. Det. Bryant and TFO Adams further testified that TFO Adams read from the card, verbatim, to advise Defendant of his rights in this case.

The testimony by TFO Adams and Det. Bryant is largely consistent with the audible portions of the recording.[10] The Court is not convinced that the inaudible portions undermine the officers'

---

in his wallet.

Audible portions of the recording confirm that TFO Adams did discuss the complaints with Defendant prior to the interview. Due to the inaudible gaps in the tape, however, the Court cannot verify from the tape whether TFO Adams additionally advised Defendant of his rights–either before or after discussing the complaints.

[9]

The only potential conflict in Det. Bryant's testimony is the timing of Defendant's consent. Det. Bryant explains that TFO Adams advised Defendant of his rights after the officers entered the residence. He further adds that Defendant consented to the search of the residence at the same time. Although Defendant may have consented at this point, this would be Defendant's second such consent in short order. The audiotape plainly reflects that Defendant first consented to the search on the front porch before entering the residence.

[10]

There are some minor discrepancies between the audiotape and the testimony of both officers. The differences primarily relate to the *precise* timing and sequence of events. Although relevant, the Court finds these technical discrepancies do not call into doubt the *substance* of the

testimony on this issue. Lastly, there is no evidence to connect the inaudible gaps in the recording to police misconduct or bad faith. Testimony and the audiotape reflect that Det. Bryant properly separated himself from the interview area to search the residence.

For all these reasons, the Court credits TFO Adams's testimony and concludes that TFO Adams timely advised Defendant of his rights. Accordingly, and because the circumstances indicate that Defendant freely spoke with TFO Adams following the proper *Miranda* warning, the Court **declines** to suppress the statements.[11]

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. As defined by § 636(b)(1) and local rule, within ten days after being served with a copy of this recommended decision, any party may

---

testimony. The Court attributes any differences between the testimony and the audiotape to imperfect memories rather than deliberate fabrication. *See United States v. Small*, 664 F.Supp 1357, 1366 (N.D. Cal. 1987); *see also United States v. Van Shutters*, 163 F.3d 331, 335-36 (6th Cir. 1998). Thus, the Court is confident that the testimony by TFO Adams is generally accurate and that he advised Defendant of his *Miranda* rights sometime prior to the interview.

[11]

By satisfying *Miranda*, there is no presumption that police compelled Defendant's statements in this case. Compliance with *Miranda* does not fully dispense with the voluntariness inquiry. *See Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The statement circumstances must also satisfy the Due Process Clause to the Fourteenth Amendment. *See id*. at 433-34. Colorable claims of police coercion, where the authorities otherwise adhered to the dictates of *Miranda*, are rare. *See id*. at 444 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

The due process test for voluntariness examines "whether a defendant's will was overborne." *See Dickerson*, 530 U.S. at 434 (citation omitted). The test takes into consideration "the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation." *See id*. (citations omitted). In this action, Defendant does not suggest coercion, and no evidence indicates coercion. Rather, the totality of evidence–including the tape, the defendant's demeanor, the defendant's characteristics, and the environment-- shows that Defendant willingly and freely talked to TFO Adams after the *Miranda* warnings.

serve and file written objections to any or all portions for consideration, de novo, by the District Court.

        This the 28th day of December, 2006.

Signed By:
Robert E. Wier    REW
United States Magistrate Judge