UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:06-CR-107-KKC-HAI-1 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| RONALD DEATON STATON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On referral from Chief Judge Caldwell, the Court considers a reported violation of supervised release by Defendant Ronald Staton. Chief Judge Caldwell entered a judgment against Staton in April 2007 for possession with intent to distribute methadone and oxycodone, in violation of 21 U.S.C. § 841(a)(1), and carrying a firearm during or in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). D.E. 31. Staton received a total sentence of 93 months of imprisonment followed by five years of supervised release (consisting of three years on the drug offense and five years on the firearm offense, to be served concurrently). *Id.* at 2-3. Staton began his supervised release term on January 8, 2014. This is his second revocation.

Proceedings on Staton's first revocation began on February 10, 2015, when the United States Probation Office ("USPO") issued a Supervised Release Violation Report and secured a warrant. D.E. 50 at 1. The report charged Staton with violating the special condition that he abstain from alcohol use. *Id.* During two visits to Staton's home, his probation officer saw alcoholic beverages,

1

and Staton admitted drinking. *Id*. at 1-2. The report also charged Staton with violating a state law when he operated a motor vehicle without a license. *Id*. at 2.

At the final hearing on March 10, 2015, Staton stipulated that he had committed both violations. D.E. 50 at 2. The Guidelines Range was three to nine months. *Id*. at 3. Upon the undersigned's recommendation, Chief Judge Caldwell imposed a term of incarceration of four weeks, followed by a four-year term of supervised release. *Id*. at 5-6. The Court further ordered as a condition of his release that Staton had to wear a Transdermal Alcohol Detector ("TAD") monitoring device on his ankle for the first six months of supervised release, to be paid for by Staton. *Id*. It was Staton, through counsel, who suggested using such a device. *Id*. at 4. Staton was released from prison on March 24, 2015.

The current violation stems from a Supervised Release Violation Report ("USPO Report") issued by the USPO on July 30, 2015. Again, the report accused Staton of violating the term of his release that required him to abstain from alcohol use—a Grade C violation. According to the USPO Report, at 2:41 a.m. on July 28, 2015, BI Incorporated, the company that monitored Staton's TAD ankle monitor, began generating alerts that Staton had consumed alcohol. Later that day, BI Incorporated confirmed that the alerts had recorded "an alcohol drinking event." Staton's probation officer visited him at home and found an empty beer can on Staton's porch and another empty beer can in Staton's kitchen trash. Staton denied drinking and told the officer that a neighbor had left the beer cans. On July 29, BI Incorporated produced a report on Staton's "drinking event" ("BI Report," admitted as Plaintiff's Exhibit 1 at the hearing) that records elevated levels of alcohol in Staton's sweat between 2:16 a.m. and 6:11 a.m. on July 28.

Staton denied drinking alcohol and insisted the TAD device had generated a false positive.

2

This Court held a final supervised release violation hearing on September 29, 2015, to determine whether the government could prove by a preponderance of the evidence that Staton had violated his condition of release by drinking alcohol.

The first witness was Staton's supervising probation officer Nick Jones. Officer Jones testified that he had installed the TAD device and described the events of July 28 and 29, 2015. In addition to confirming the information in the USPO Report, Officer Jones testified that Staton told him nothing about medications during his visit on July 28. Officer Jones said he knew other people would visit Staton and drink at his house. Officer Jones testified that Staton did not appear intoxicated or smell like alcohol on the afternoon of July 28, and that he did not remember whether Staton requested a drug test to confirm the drinking event.

The government's next witness was Rick Miller, a product engineer for BI Incorporated. By agreement by the parties, he testified by telephone from Boulder, Colorado. Miller explained that he was involved in developing all of BI's hardware products, including the TAD from its inception. He explained that he supervised regression and functionality testing of the TAD and had studied thousands of TAD charts like the one in Staton's case.

Miller described how the TAD works, including the functions of each of its eight sensors. He explained that when a TAD generates a series of alerts, a group of people based in Indiana studies the alerts to determine whether they indicate a "drinking event." If so, they issue a report. In difficult cases where the alerts are ambiguous, cases get sent to "second-level review," where an expert such as Miller determines whether a drinking event has occurred. Miller also testified that people who are outfitted with a TAD are supposed to be given a list of "banned substances" that have the potential of registering a false positive alert.

Turning to Staton's BI Report, Miller testified that this was not a "tricky case." The graph in Staton's BI Report, he said, captured a "classic drinking event." Miller said nothing in the BI Report indicated that the alerts were generated by medication or something like lotion on the skin. Miller focused on the way Staton's temperature and skin resistance readings (as graphically represented in the BI Report) rose in tandem with his alcohol reading. Miller testified this correlation was common in a "by-the-book" drinking event.

The defense called Mary Crew, who rents a home from Staton on Staton's property. She testified that she had not seen Staton drinking during the time in question, and that she knows Staton's friend James Brown sometimes visits Staton and leaves beer cans at Staton's house. Crew also said that, back when Staton drank, he drank bottled beers, not canned beer.

Finally, Staton testified, and denied any use of alcohol. Staton denied receiving a list of banned products when the TAD monitor was installed. Staton identified three things that could have triggered the TAD. First, Staton was using eye drops to treat glaucoma that he said might contain alcohol because they burned his eyes. Second, Staton said he had been using a face cream since the 1960s that included alcohol. Third, Staton testified that he had cleaned his bathroom with CLR (a strong cleaning product) a few hours before the TAD alerts began. He said he had his leg in the bathtub and that CLR had splashed on his legs. He also said the strong fumes nearly "knocked [him] out." On cross examination, Staton explained that on July 27 he had used the eye drops in the morning, that he had used the face cream around noon, and that he had cleaned his bathtub from around 8:00 p.m. to around 11:00 p.m, when he went to bed.

Staton insisted he had kept the promise not to drink that he made to the Court during his previous revocation hearing. He testified that his friend James Brown had left the empty beer cans at

his home. Staton also said he had asked Officer Jones to administer a blood test so he could prove he had not been drinking during the night. On cross-examination Staton admitted he was an alcoholic but said his promise to the Court meant more to him than alcohol.

After the close of evidence, Staton's counsel argued that the Court should disregard Miller's testimony because he was insufficiently qualified and that there was insufficient proof the TAD device was reliable. The government, in turn, argued that Miller was the best witness to address the functionality and reliability of the TAD because he had developed and tested it, including using it on himself, and was a member of the second-tier review team that interpreted ambiguous TAD charts.

Finding Miller sufficiently qualified, the Court denied Staton's oral motion to exclude Miller's testimony and ruled that the government had met its burden of proof. The key issue before the Court is whether the BI Report shows an instance of alcohol consumption by Staton, or whether some other event generated the TAD's recorded alcohol levels. Staton's theory was that his eye drops, face cream, and bathroom cleaner (either individually or in combination) caused his alcohol levels to spike in the night while Staton was asleep, thereby generating a false positive. The Court, however, found the government's theory much more plausible. It is more likely that Staton's BI Report—which contained what Miller described as a "by-the-book" and "classic" drinking event— recorded what BI's review team claimed it recorded—a spike in body temperature, resistance, and alcohol level caused by the ingestion of alcoholic beverages. This theory is bolstered by the facts that Staton is an alcoholic and that the Officer found two empty beer cans at Staton's house. The Court does not find it plausible that eye drops taken in the morning, face cream used at noon, and bathroom cleaner used at 8:00 p.m. could trigger a TAD "drinking event" at 2:16 a.m. while Staton was fast asleep. Compared to the BI Report, as interpreted by Miller, Staton's testimony was not

credible.

The Court held a second hearing on October 1, 2015, to address Staton's sentence. The government asked for a nine-month sentence, followed by three years of supervised release. The government also stated that reimposing the TAD device would be appropriate. Although Staton did not request a specific sentence, he asked for mercy. Staton explained he was a Vietnam War veteran with medical issues stemming from exposure to Agent Orange. Staton addressed the Court and continued to insist he did not drink any alcohol. Staton reported, for the first time, that he was forbidden from drinking alcohol in conjunction with a medication he was taking "for nerves."

The Court has evaluated the entire record, including the USPO Report and accompanying documents, and the sentencing materials from the underlying Judgment in this District. Additionally, the Court has considered all of the § 3553 factors imported into the § 3583(e) analysis. Under § 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction. Defendant pleaded guilty to possession with intent to distribute a quantity of Schedule II substances, and carrying a firearm during or in relation to a drug trafficking crime. *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 924(c)(1). Such convictions are Class C and Class A felonies, respectively. *See* 18 U.S.C § 3559. For a Class A felony, the maximum revocation sentence provided under § 3583 is five years of imprisonment. *See* 18 U.S.C. § 3583(e)(3). The Policy Statements in Chapter 7 of the Guidelines provide advisory imprisonment ranges for revocation premised on criminal history (at the time of original sentencing) and the "grade" of the particular violation proven. *See United States v. Perez-Arellano*, 212 F. App'x 436, 438-39 (6th Cir. 2007). Under USSG § 7B1.1, Staton's conduct would qualify as a Grade C violation. Given Staton's Criminal History Category of I (the category at the time of the conviction

in this District) and a Grade C violation, his Range, under the Revocation Table of Chapter 7 of the Guidelines is three to nine months.

The Court reminds Staton that the Guidelines suggest that the *primary* wrong in the supervised release context is the violation of the Court's trust by an offender; the particular conduct is an important but secondary issue. *See* Guidelines 7 Pt. A(3)(b). As this Court explained in its previous Recommended Disposition: "[Staton] has failed to abide by the special condition banning alcohol use on multiple occasions, each time attempting to explain away his behavior with flimsy excuses. The Court cautions [Staton] that no excuses will be tolerated for future violations." D.E. 50 at 4-5. This Court also warned Staton that "[f]uture violations . . . will be dealt with harshly." *Id*. at 5. Unfortunately these warnings did not take root.

The Court has carefully weighed all the relevant § 3553(a) factors, particularly the nature and circumstances of the offense, the need for education, training, and treatment, and the need to deter criminal conduct as well as protect the public. The Court recommends revocation and a term of incarceration of eight months. Although Staton's Guidelines Range for his previous violation was three to nine months, this Court imposed a lenient one-month sentence. Despite that leniency, Staton re-violated four months after his release. His breach of the Court's trust is serious, and his drinking creates a danger to himself and the people around him. The Court finds that eight months, consisting of a middle-of-the-Range sentence (six months) plus the two-month downward departure Staton received on his prior revocation to be sufficient, but not greater than necessary, to satisfy the § 3553(a) factors incorporated by § 3583(e).

A court also may re-impose supervised release, following revocation, for a maximum period that usually subtracts any term of incarceration actually imposed due to the violation. *See* 18 U.S.C.

§ 3583(b) & (h). The post-revocation cap depends on the "term of supervised release authorized by statute for the offense that resulted in the original term of supervised release." *See* 18 U.S.C. § 3583(h). Given the nature of Staon's conviction for possession of drugs with intent to distribute, pursuant to 18 U.S.C. §§ 841(b)(1)(C) and 3583(h), there is no maximum period of time that he can be placed on supervised release following revocation.

The Court recommends that a fourteen-month term of supervised release be imposed with the same conditions of Defendant's original Judgment (D.E. 31 at 3-4), modified to include the requirement that Staton use a mobile breathalyzer to monitor his compliance with the prohibition on alcohol use. The fourteen-month term of supervised release reflects the fourteen months Staton was able to stay clean before his first violation in March 2015. Upon release, Staton must report immediately to the USPO. Staton will use the SL-2 mobile breath alcohol monitoring tool for the first six months of his supervised release, to be paid for by the government. At the discretion of the USPO, Staton may also be referred to an alcohol addiction treatment program.

Based on the foregoing, the Court **RECOMMENDS**:

1. Revocation and incarceration for a term of eight months; and

3. A fourteen-month term of supervised release to follow under the conditions previously imposed at Docket Entry 31, with the modification that Defendant shall be subject to SL-2 breathalyzer monitoring for the first six months of supervised release, to be paid for by the government.

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on Chief Judge Caldwell's docket upon submission.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within fourteen days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court. Failure to make timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981); *Thomas v. Arn*, 106 S. Ct. 466 (1985).

This the 7th day of October, 2015.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge